I represent the government in this case. This is a government appeal of a 15-level downward departure. The case begins, I believe, with a principle that I think we can all agree on, and one that I think that the district court lost sight of. Parents who use their children in this case should receive an enhanced punishment, not leniency. In this case, the defendant agreed to allow a drug trafficker to stuff cocaine into her teenage daughter's bra and underwear, to have her fly to Anchorage, and to deliver those drugs to another drug dealer for about $1,500. How old is the daughter now? She is now 16 years old. Sixteen? That's my understanding, yes. If the defendant had committed this crime on her own, leaving her daughter safely behind with the relatives that they were living with, it's absolutely clear that the district court wouldn't have even considered a departure in the case, much less one so large. Now, why is that? Because the situation of the daughter being in somewhat ill health with her eating disorder and being alone and not having relatives in Mexico and her mother serving prison, none of that would be any different if she'd left her daughter alone and left her daughter at home. The defendant, at the time she agreed with the drug traffickers to bring the drugs to Anchorage, was living in California with relatives, relatives that had taken them in when they crossed the border and who had made them welcome from all accounts. The defendant's niece indeed urged the defendant not to go through with this plan, and there's no reason to believe that she could not have left her daughter safely there behind while she committed this crime. But there's no evidence to believe that she could have. I mean, your argument is not even in the record. There is evidence that she could have. That she was there, but not that the relatives would have taken care of the daughter indefinitely. There is actually evidence in the record that the daughter's guardian ad litem had identified this niece in California as someone who would be potentially available to take in the daughter should the mother go to prison. Tell us where to look. I'm sorry, I don't have the site. It's cited in my brief, and I'll be happy to provide you with the page number and the record. Wasn't there a problem there that even if the people in San Jose said, look, we'll take care of her, although she's in prison, you've got an illegal alien. Wouldn't the immigration people have deported her anyway? That is a possible outcome of the situation. She is a deportable alien. Has she been under a criminal trial or whatever? She was at the time of the sentence. She is no longer subject to criminal charges. Okay, they dropped the criminal charges against her? That's right. The criminal charges are no longer pending against the daughter. But she's still here. My understanding, and again, this is outside the record, but my understanding is that the daughter is still in Anchorage. She is still living with the foster mother who had been and that she is, in fact, resisting deportation at this point. That's my understanding. I'm afraid it's off the record, but the situation with the daughter at this point. Because this defendant chose to involve her daughter in a crime, and it literally is because she made that choice, subjecting her to the risk of face-to-face dealings with drug traffickers, with the risk of arrest, the embarrassment of a strip search, because her mother made those choices. The defendant is essentially now being sentenced to time served and released to go home, serving no additional time in prison at all. Won't they both just be deported? I don't know, what is the mother's custodial status right now? The mother is being held pending the outcome of this appeal. Even though the sentence was time served, she's still in prison? That's right. She is being held pending appeal in the same way that she was being held before her trial because of the risk of flight. So now the time served sentence is getting longer, right? How long did it take for this to happen? She was sentenced in October of last fall. She has now been held about a year and a half. Her guideline sentence would have been just under four years, the sentence that she and the government agreed to in the plea agreement as being an appropriate sentence for her offense. Yes, the time that she has served to date, were she sentenced pursuant to the guidelines, would be credited to the ultimate time that she would end up serving. But that's not her punishment. She's not being held now as punishment. She's being held pending appeal. I don't think that would make much difference to someone who's in prison, the reason they're in prison. But anyway, assuming she was released, would they not both be deported? Predicting what would happen to the daughter, I think, is difficult at this point. I'm not an immigration expert. I understand that she is fighting deportation. Right, but that implies that the government's trying to deport her, right? When you said that? Yes, the government would be trying to deport them both. They were both drug traffickers caught in the country committing crimes. The government would seek to deport both of them. So then they could both go to Mexico and the mother could take care of the daughter. That's what the district court presumed, yes. Right. I mean, I don't see what's wrong with that. What's wrong with that is that a woman who has committed a serious drug offense is essentially being released with no punishment to go home. The message that that would send to drug traffickers is a frightening one. Use your daughters. Use your children. Use them as a shield. Come into the country. If you're caught, the worst that will happen is you'll be sent home. That to me is a frightening message to send and would encourage drug traffickers to seek out vulnerable women with children. Tell them nothing's going to happen. If you get caught, they'll just send you back home. And that is a very dangerous message for this country to be sending. I guess another possibility is that the women with children would seek out drug traffickers looking for lucrative work, employment. Which would be an equally frightening prospect, I believe. In this case, a downward departure by a district court judge is authorized only if he or she is able to find extraordinary family circumstances. This court set out in U.S. v. Leon what extraordinary family circumstances might be. And in this case, I suggest that rather than focusing on what the defendant did and on what an appropriate punishment for her crime might be, the district court ended up being distracted by his fear for what might happen to his daughter. What was the big deal with the daughter? I read it and I couldn't see what was so wrong. I mean, a teenage girl who has kind of an excessive focus on her diet and how much she eats? It sounds like half of mankind. I believe that there's nothing unusual about this daughter. She is, by all accounts, by all the evidence in the record, a healthy, thriving teenager. She has suffered stress and some depression and apparently some eating disorders as a result of her concern. Yes, let's stop at the eating disorder. Eating disorders can lead to death, can't they? Don't they? I mean, you can't just dismiss out of hand an eating disorder. Your Honor, I'm sorry. The foster mother testified that the daughter was having some trouble with her stomach. And she had psychological problems and depression. Which were being successfully treated. That is the evidence in the record, Your Honor. There was no medical testimony of any sort to explain or to suggest what the degree of severity of... There was never any physician who testified or doctor's report or other medical report from any qualified physician or other health personnel? None whatsoever. Anorexia or anything of that nature? Nothing of that sort. The foster mother testified that she had taken the daughter to a doctor, that the daughter had been treated, and that by all accounts, she'd improved immeasurably. She was doing much better. That is the evidence in the record as to the physical and mental... Referring to the transcript at ER 99? The foster mother's testimony? Right. About the eating disorder, depression, being treated with Zoloft, diagnosed with bulimia, which can cause death. That's what I read in the record. I don't understand why you're saying there's no evidence of these kinds of things in the record. There is no medical testimony in the record. The guardian also testified that the daughter was suffering from some depression, and that it was his understanding as well that she was being treated. This depression that the guardian testified to, this is after she and the mother got busted coming in with the dope, right? That's correct. So we don't know if the depression is because her mother involved her in drug smuggling, or if it's some pre-existing thing. I think it's safe to conclude that most teenage children whose mothers are in prison will suffer some significant stress. I think, again, you're talking outside the record. You're just supposing and speculating about this. Let's talk about what the district court actually gave as its reasons for finding extraordinary circumstances. The district court gave two reasons for his conclusions. He gave a third reason. He suggested that the defendant's behavior was aberrant, but did not rely on that factor in his written findings, and did not give the government notice of any intent to rely on that factor. So I would suggest that The court's supposed to give the government notice? That's correct. Before the district court's sentences departs downward, the parties are to receive notice so that they can present their views and evidence on that issue. But with respect to the extraordinary circumstances that the district court found, he relied on two factors. One, he relied on the daughter's health problems, both psychological and physical, her depression and her eating disorder. But more fundamentally, and I suggest that since he said he would not even be considering a departure if the defendant was not a foreign citizen, more importantly, he relied on a presumption that if the daughter were deported while the mother were in prison, that she would merely be left at the border to her own devices with no one to watch out for her. All the record evidence is entirely the contrary, that that is not what would occur. Well, there was a letter from the border patrol person which the district judge did not credit. The district court judge did not say he was not crediting the letter. He simply seemed to ignore the letter. He said that he remained concerned that nevertheless, this daughter would be left at the border with no one to care for her. In fact, the evidence was that it is the practice of the ICE to contact relatives into whom a minor can be safely delivered or if no one can be found, to deliver them to the proper authorities similar to the child care of children in whatever country the child is going to. Counsel, was there any evidence about whether there is any extended family in Mexico? There was considerable evidence of that. In fact, the defendant in this case has six siblings, at least one of whom she herself had identified as someone who could take in her daughter. In addition to that, the defendant has two adult daughters, older than the minor daughter in this case, both living in Mexico. In addition to that, the daughter has a father. Now, there is no evidence in the record that there is any continuing contact with the father except that the defendant did testify that the father helped them get passports for their trip to the United States. But in any event, what all of this demonstrates, I believe, is that rather than affirmative evidence of an extraordinary family circumstance, the judge was speculating that there might not be a family member there, contrary to all of the evidence, and that there might not be anybody to take care of this child. Counsel, I overlooked the time. Well over, I'm sorry. My colleagues have further questions. Good morning. My name is Sue Ellen Tadder. I represent Genoveva Diaz Valencia, the defendant in this case. I think Judge Singleton did the right thing. He gave the prosecution 39 days between the time he mentioned Leon and the time of the hearing to assemble evidence and to prepare a cross-examination. They didn't bring any witnesses, and they didn't describe anything about the immigration procedure. Counsel, when I look at the judge's written statement of reasons for the departure, he said, what's extraordinary here? I think this case was exceptional. What family circumstances are extraordinary? Here's one of the exceptional things in this case. This mother was really helpless. She had a fourth-grade education. She was a nice person. She had a very nice daughter that she raised properly in spite of abysmal poverty. That's extraordinary so far? Yes. And this daughter was... A nice mother with a nice daughter is not extraordinary. At the time of sentencing, it was extraordinary. The daughter was in foster care being prosecuted by the state of Alaska. Soon thereafter, when the state judge dismissed it, she was prosecuted by the federal government. And she was miserable, and she was taking Zoloft. It's not... Being miserable when you get prosecuted for drug smuggling is not extraordinary either. I'm trying to get what's extraordinary. The people at the end of this transaction, the two women who came to Anchorage, were exceptionally manipulated. Someone sewed cocaine into the crotch of their garments and sent them to Anchorage. How do we even know they're exceptionally manipulated? It looked like the mother had employment before, but this looked like it would produce more money. For all I know, it was the mother's idea. Well, she told in her elocution before the judge indicated an intent to depart, in the very first elocution, she described why she did it. And she described another medical problem that the daughter had, and how she was just desperate without any money. She cooperated fully with the government and gave ample description of... She worked on a ranch and had regular employment. No, she... In Mexico, she struggled. She scrambled on a ranch. She sold lemons occasionally. She sold chickens. She sold eggs. And then she came to the United States, hoping that things would be better. She was desperate in San Jose. She wasn't living with an extended family. The prosecutor is wrong. She had a niece that she mentioned in her elocution that gave them temporary housing. And she didn't feel welcomed there. She felt like she couldn't make enough money to pay the people that were having the house. She wasn't allowed legally to work in the United States. Right. And she wasn't supposed to work. This is the kind of case that if you look on the surface of it, it looks really bad. And the prosecutor said she used her children, her was a desperate person. And she's a very nice person who raised an exceptional daughter. And I think that's what struck the guardian ad litem, who testified for quite a while, uncross-examined virtually, about this young woman's... She was industrious. She was a good student. She was very cooperative. She loved her mother. This was a good, bonding relationship. Why not double the punishment for putting such a nice, young daughter in this terrible position? But she's partly... Cutting the punishment out. But she's partly nice because of the mother. I mean, the mother was very conscientious about this child's well-being and about her medical problems. And she made a single terrible mistake. And they came together through the Anchorage airport, and they completely confessed. They cooperated. I signed a plea bargain. Because they wanted her cooperation, the government didn't move her any downward departure. And my take on that is this defendant was so far at the end of this, so outside any drug world, that she just... And she wasn't very educated or well-spoken. We didn't get any benefit from the cooperation. But you can see in the case, she expressed remorse. She expressed remorse before Judge Singleton. He saw the people, and he heard the guardian ad litem, who testified at length. And he heard the foster mother. Both of them said she was in an exceptional position. She was exceptionally distressed. Medical doctors don't give Zoloft to 15-year-olds. It's a very powerful drug. And they don't give it out like candy. This is a very... She was in a serious position. And she was a good, worthwhile person who, with her mother, would have a good life. Now this extended family the prosecutor talks about just wasn't there. The guardian ad litem tried for months and months to locate people. And at the time of sentencing, he had found nobody. There was mention of an aunt in California. That is what I understood was the only extended family in the transcript. But ever since... I'm sorry, I didn't hear. That is what I understood was the only so-called extended family that was in the record. So I've been looking ever since the government represented that there were tons of relatives in Mexico. And that's just not in the record. But that's what I understood. I thought the aunt was in Mexico. The aunt was in Mexico. That's what Curry Cook, the guardian ad litem, said. And he was making efforts to locate her. And he had not been successful at the time of the hearing. In the defendant's allocution, Genoveva mentioned that she came to San Jose because she thought she could stay with a nephew and his wife. And there were a lot of people living there. And Genoveva felt that she wasn't welcome after she couldn't contribute to the food and phone and rent. So what the prosecution is talking about as a niece is the nephew's wife who didn't welcome them anymore in San Jose. And she's the one that was mentioned in the allocution. Curry Cook, the guardian, who studied this case, he did a lot of work on behalf of this young woman trying to keep her from being deported, which happened the night before the hearing, trying to... I thought the problem with living in San Jose, I thought, was not being legally entitled to live permanently in San Jose. They're Mexicans. And the mother had a card that entitled her to cross up to six months but not work in the U.S. Right. They had old visas. And they were probably overstaying their visas. And she wasn't supposed to be working. And she was trying to work, I suppose, under the table, but she wasn't successful. The San Jose problem, I think if you look at her allocution, I remember her telling Judge Singleton that the daughter had a problem with excessive sweating and refused to go to school. And she couldn't afford medical care. And she couldn't afford medication for high blood pressure. And she got worried that they needed both these kinds of treatment and they were stuck without jobs with relatives or extended family or maybe strangers. It was a big house and one of the couples living in the house was a nephew from her hometown. And they weren't welcome. They couldn't contribute to the overhead of this family. So they went to Reno or, no, Ontario, California and somebody gave them a ticket to go there and get these drugs sewn into their garments. And they were sent to Alaska. Now, was there some, I don't know if this was in your brief or if this was testimony that I read. I just can't recall right this second. But was there something in the record that she didn't want to leave her daughter alone with this other family? And so she was going to bring her up here with her. And then she thought, well, she might as well carry drugs too and then we'd get another 50. But she wasn't setting out, as some do, to use children. There was no finding or nothing in the evidence in the record that she wasn't setting out to use her daughter as a cover. No, that's absolutely true. And you notice that the pre-sentence report writer told the story as well as I can. He said they were in California and there was no place for the girl to go if the mother was going to do this and the girl wanted to stay with her mother. They were very equal, although there's a big age gap in terms of sophistication and intelligence, because my client has this fourth grade education and she comes across as a very distressed, helpless person with medical problems of herself and her daughter. Now, why, as soon as this was over, as the court has noticed, the daughter got arrested on federal charges. The government got re-arrested my client and she was put in jail. We moved for a bail pending appeal and this is all part of the record. And the magistrate found her not a flight risk and not a danger to society and he said it would be a tragedy or a miscarriage of justice for her to do extra time since she had already done her sentence. They put her in the halfway house and she, after the sentence, while the appeal was pending, she's in the halfway house and she has so many medical problems that the halfway house can't handle her and they put her in the halfway house. It's the Seattle-Tacoma Detention Center. It's the federal detention center, which is the closest federal facility to us. So, I would like to ask the court to affirm what Judge Singleton did, because the government is now saying in all its Blakely briefs and issues that the sentencing guidelines are supposed to be a flexible, individual crafted sentence and Judge Singleton, on his own, from reading the pre-sentence report without input from us, gave notice that this was an important issue for him after he read Leon and he gave the government a long time. They didn't bring any immigration people. They didn't cross-examine the guardian ad litem about how trivial the medical problems were and they didn't bring any witnesses and both the guardian and the foster mother testified at length and were themselves, in person, very impressive people about what they noticed and what their efforts on this family's behalf. I think you should affirm Judge Singleton, but practically speaking, that doesn't help me or my client. My client's in SeaTac in prison and her daughter's here and even if they got deported, they would get deported, which is a constant danger for the daughter and she doesn't want to be deported without her mother. She doesn't have any place to go in Mexico. I think there should be some kind of remand to Judge Singleton. If you think he didn't make enough findings, I think that he can make more findings and I think this court has remanded in other situations like where there were inadequate findings for application of the safety bell. So I have no problem with either relief, but if the case is remanded, I think it's very problematic how he should be limited. I cited the Wright case, which I think is a review of a very unusual upward departure situation, but that judge didn't make detailed findings either and under a de novo standard, his upward departure was affirmed. I think, practically speaking, in the hearing, with the live witnesses and the live testimony, that my case is as exceptional. On the surface, it doesn't, you know, it sounds bad the mother used her daughter, but it was a very unusual situation and I think the guidelines, if they apply, if they exist, they should provide some indication, some flexibility for a judge who's been a judge for a long time and has seen a lot of drug cases and doesn't like drugs and what they do to people to say this is an unusual situation. Thank you, counsel. I know my time is up. I just wanted to direct. You went over your time, thank you. You want the record side? I have the record. I have the record. Thank you. United States v. Diaz-Valencia is submitted. Next is Jackson v. Pugh. Jackson v. Pugh.
judges: Hall, Kleinfeld, Wardlaw